# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-SA-01558-SCT

*THE MISSISSIPPI METHODIST HOSPITAL AND
REHABILITATION CENTER, INC. d/b/a
METHODIST SPECIALTY CARE CENTER*

*v.*

*MISSISSIPPI DIVISION OF MEDICAID AND
DREW L. SNYDER, IN HIS OFFICIAL CAPACITY
AS EXECUTIVE DIRECTOR OF THE
MISSISSIPPI DIVISION OF MEDICAID*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/12/2019 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| TRIAL COURT ATTORNEYS: | DION JEFFERY SHANLEY |
| | ANDY LOWRY |
| | BEATRYCE McCROSKY TOLSDORF |
| | THOMAS L. KIRKLAND, JR. |
| | SAMUEL PHILIP GOFF |
| | JANET McMURTRAY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | THOMAS L. KIRKLAND, JR. |
| ATTORNEYS FOR APPELLEES: | JANET McMURTRAY |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA L. GIBBES |
| | SAMUEL PHILIP GOFF |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 06/10/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Methodist Specialty Care Center (Specialty), a hospital-based nursing facility owned

by Methodist Rehabilitation Center (Methodist), included an allocation of Methodist's Medicaid Assessment in its nursing-facility cost report. The Division of Medicaid (DOM) disallowed the allocation for Specialty's cost report, finding that Methodist's assessment was not an allowable cost for Specialty. Specialty appealed the decision to the Hinds County Chancery Court, which affirmed the decision of the DOM. Because Methodist's assessment was not an allowable cost for Specialty under the plain language of the State Medical Plan (Plan) and the Medicaid statutory structure, this Court affirms the decisions of the DOM and the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶2. Specialty is a nursing facility owned by Methodist, a hospital. Hospitals and nursing facilities are treated as completely separate providers under the Mississippi Medicaid program and file separate cost reports. This is true even when the nursing facility is hospital based. Both Specialty and Methodist are participating providers in the Mississippi Medicaid program.

### *1. Medicaid Treatment of Nursing Facilities and Hospitals as Separate Providers*

¶3. The DOM levies assessments on various types of facilities, and these assessments help fund the Medicaid program. Miss. Code Ann. § 43-13-145 (Rev. 2015). Nursing facilities pay an assessment for each licensed and occupied bed, and that assessment is "equal to the maximum rate allowed by federal law or regulation[.]" Miss. Code Ann. § 43-13-145(1)(a) (Rev. 2015). Hospitals pay an assessment calculated by a variety of factors. Miss. Code

2

Ann. § 43-13-145(4) (Supp. 2020).[1]

¶4. The DOM reimburses qualified providers for covered services pursuant to the applicable Plan. These reimbursements are determined based on the provider's cost data, submitted in compliance with Medicaid's cost reporting rules. Hospitals submit costs and are reimbursed in accordance with State Plan 4.19-A. Nursing facilities submit costs and are reimbursed in accordance with State Plan 4.19-D. Thus, nursing facilities and hospitals have separate assessments, separate reimbursements, and file separate cost reports.

### 2. *Medicare and Business Principles Treatment of Methodist and Specialty as One Entity*

¶5. It is undisputed that, for business purposes, Methodist and Specialty are one entity. Methodist owns Specialty, and they do not have separate finances or operating organizations. It is likewise undisputed that, for Medicare purposes, Methodist and Specialty are one entity. Methodist is the Medicare "provider," and Specialty is one of its "cost centers." Ctrs. For Medicare & Medicaid Servs., *Provider Reimbursement Manual* 15-1 § 2302.16, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based -Manuals-Items/CMS021929 (last visited May 27, 2021).[2] [3] Methodist may allocate costs to

---

[1]Intermediate care facilities for the intellectually disabled and psychiatric residential treatment facilities are also separate Medicaid providers and are separately assessed. Miss. Code Ann. § 43-13-145(2), (3) (Rev. 2015).

[2]This source is referred to as "CMS PRM 15-1" throughout this opinion.

[3]The federal Centers for Medicare and Medicaid Services (CMS) issue a Provider Reimbursement Manual (PRM). CMS PRM 15-1 guidelines refer to the Medicare guidelines, which do not separate hospitals and hospital-based nursing facilities, but do provide guidelines for allowable costs. For Medicare purposes, Methodist is the "provider" and Speciality is treated as one of its cost centers, not as a separate provider.

3

its various "cost centers" for Medicare reporting purposes.

¶6.     Medicare guidelines provide that two types of departments within a provider exist. CMS PRM 15-1 § 2306. Revenue-producing cost centers generate patient-care revenue and include nursing facilities such as Specialty. *Id.* Nonrevenue-producing cost centers do not generate patient-care revenue but are used by other departments as a service. *Id.* Examples of nonrevenue-producing cost centers include laundry, dietary, and housekeeping. *Id.* "[T]he cost of the revenue-producing centers should include both its direct expenses and its proportionate share of the costs of each nonrevenue-producing center (indirect costs) based on the amount of services received." *Id.* Methodist uses the "step-down method" to determine these allocations. CMS PRM 15-1 § 2306.1. It consequently allocates a portion of certain costs to Specialty.

### 3.     *Medicaid Treatment of Costs for Nursing Facilities Within Hospitals*

¶7.     Medicaid requires nursing facilities to use Medicaid forms and schedules for Medicaid cost reporting. Medicaid Instructions for Filing Long-Term Care Facility Cost Report, https://medicaid.ms.gov/wp-content/uploads/2020/06/Instructions-2020-revision -doc-6.24.20-1.pdf (last visited May 27, 2021). Medicare "cost reporting forms are not acceptable in lieu of these forms." *Id.* However, Medicaid acknowledges that hospital-based nursing facilities may use cost allocation to determine certain revenue and costs and provides that "[h]ospital-based facilities . . . which use the Medicare forms for step-down in completing their cost report must submit a copy of the applicable Medicare cost report forms." *Id.* This recognizes that when stand-alone nursing facilities directly incur some

4

certain costs, hospital-based nursing facilities may not directly incur those costs because the hospital incurs them for the nursing facility and its many other departments.

### 4. Inclusion of a Portion of Methodist's Assessment on Specialty's Cost Report

¶8. Manuel Pilgrim testified that he began working as the Medicaid Director of Financial and Compliance Review in 2015. In his audit review of 2012 cost reports, he noticed that some nursing facilities had been including an allocation of the hospital assessment in their cost reports. Medicaid identified this as incorrect and began adjusting nursing-home cost reports accordingly. Pilgrim testified that hospital accounting and reimbursement methods changed in 2012 in a manner such that, prior to 2012, it would not have mattered much where the hospital assessment was placed with regard to how much a facility was reimbursed. While including the allocation on Specialty's cost report would have increased Specialty's reimbursement, doing so would have also decreased Methodist's reimbursement by a corresponding amount. After 2012, the hospital reimbursement methods changed, and the inclusion of the hospital assessment in a nursing-facility cost report would increase the nursing facility's reimbursement without decreasing the hospital's reimbursement.

¶9. Medicaid witnesses noted that the inclusion of the hospital assessment in a nursing-facility cost report could not be easily identified in a desk review of a nursing facility cost report. The portion of the hospital assessment included on the nursing facility's cost report was not a separate line item but was included in a lump sum of "Administrative and General Expenses" that were stepped down by the hospital. Pilgrim testified that he had to pull several different documents and make his own calculations to determine that this allocation

5

was being included on some nursing-facility cost reports.

¶10.    In its 2014-15 cost report, Specialty included its own nursing-facility assessment in the amount of $296,652 on line 4-43.  It also included a portion of Methodist's hospital assessment.  Methodist was assessed $2,576,255.  Specialty's cost report included line 4-47 for "Allocated Costs - Hospital Based & State Facilities" in the amount of $4,419,161.  Included in that number, but not separately identified, was $539,681 attributed to the portion of Methodist's hospital assessment that it allocated to Specialty via *Medicare* accounting methods.[4]  Specialty represented that it had been including such an allocation of Methodist's hospital assessment on Specialty's Medicaid cost report for a number of years.  The DOM's desk review adjusted Specialty's cost report, reducing line 4-47 by $539,681 and the adjustment as communicated to Specialty on November 17, 2016.  Including the allocation on Specialty's cost report resulted in an increased per diem reimbursement for Specialty but had no impact on the reimbursement that Methodist received.

¶11.    Specialty filed an appeal with the DOM in December 2016, which the DOM denied.  Specialty then requested an appeal and administrative hearing.  The hearing occurred on December 19, 2017, before an administrative-hearing officer.  Both the DOM and Specialty presented expert testimony regarding whether it was appropriate for Specialty's cost report to include an allocation of Methodist's assessment.

¶12.    The hearing officer recommended that the DOM deny Specialty's appeal. The hearing officer found that, under the State Plan, nursing facilities may only claim costs incurred by

---

[4]Again, while hospitals must file cost reports with Medicare, hospital-based nursing facilities do not filed separate cost reports with Medicare.

6

the nursing facility for the benefit of its patients. He found that Specialty did not incur the expense of Methodist's hospital assessment, nor did the hospital assessment benefit the Specialty patients; thus, he found the allocation did not qualify as an allowable cost for Specialty. The hearing officer further found that, even if the allocation to Specialty was proper, the allocation of Methodist's hospital assessment should have been "netted" against a portion of the Medicaid reimbursement amount that Methodist received. The DOM adopted the hearing officer's report, thus denying Specialty's appeal.

¶13. Specialty appealed the DOM's final order to the Hinds County Chancery Court. The chancery court affirmed the final order of the DOM. It held that the hearing officer's conclusion that Specialty patients did not receive a benefit from Methodist's assessment was not arbitrary or capricious and was supported by substantial evidence. It consequently held that Specialty failed to meet its burden of proof to overturn the DOM's order.

¶14. Specialty appeals to this Court. It argues: 1) the allocation was proper because Methodist's assessment is an allowable cost for Specialty, 2) Specialty patients benefit from Methodist's assessment, 3) netting is not appropriate, 4) the DOM's adjustment was improperly retroactive, and 5) the DOM's adjustment violated the Administrative Procedures Act.

## ANALYSIS

### 1. Standard of Review

¶15. In reviewing a chancellor's opinion regarding a DOM decision, this Court reviews the agency's order to determine whether it "1) was supported by substantial evidence, 2) was

7

arbitrary or capricious, 3) was beyond the power of the agency to make, or 4) violated some statutory or constitutional right of the complaining party." ***Cent. Miss. Med. Ctr. v. Miss. Div. of Medicaid***, 294 So. 3d 1121, 1125 (Miss. 2020) (internal quotation mark omitted) (quoting ***Adams v. Miss. State Oil & Gas Bd.***, 139 So. 3d 58, 62 (Miss. 2014)). Acts are arbitrary or capricious when done without reason or judgment. ***Id.*** This Court does not defer to an agency's interpretation of a statute because interpreting statutes is the province of the courts. ***Id.***

¶16. Currently, this Court defers to an agency's interpretation of a rule or regulation, despite the fact that we review an agency's interpretation of a rule de novo, because such an interpretation is a matter of law. ***Id.*** However, the same reasons that applied to ending deference for an agency's statutory interpretations apply equally to ending deference for an agency's interpretation of rules and regulations. The "de-novo-but-with-deference standard is confusing and vague" and lacks consistency in application. ***Id.*** at 1130-31 (Coleman, J., dissenting) (citing ***King v. Miss. Military Dep't***, 245 So. 3d 404, 407 (Miss. 2018)).

¶17. Moreover, "[a]s is the case with deference to agency interpretation of statutes, the standard for deference to agency interpretation of regulations cannot be squared with Mississippi's Constitution of 1890." ***Id.*** at 1131. The Constitution provides for a separation of powers amongst the three branches of government, with no branch allowed to exercise the power belonging to another branch. Miss. Const. art. 1, § 2.

> In ceding the rule-interpreting power of the courts to the executive branch by giving deference to agency interpretation of regulations, the Court in the past has put all or part of all three functions of government—rule making, rule enforcement, and rule interpretation—in the hands of one branch.

8

*Id.* "[E]xecutive-branch agencies should follow their regulations and, in the absence of a judicial holding, must decide the meaning of their regulations. However, when the interpretation of a regulation comes into a third-branch courtroom, the ceding of judicial authority to the executive branch violates article 1, section 2." *Id.* at 1131-32 (citing *King*, 245 So. 3d at 408).

¶18. Deferring to agency interpretations of rules and regulations is inconsistent with the standard of review for statutory interpretation, causes confusion, causes inconsistencies in application and within our own caselaw, and violates article 1, section 2, of Mississippi's Constitution. This Court will no longer apply this "inherently self-contradicting standard of review for agency interpretations of agency-promulgated regulations[.]" *Id.* at 1130. For these reasons, this Court overrules past precedent regarding such deference and will henceforth review agency interpretations of rules and regulations de novo, without deference to the agency's interpretation.

### 2. *Cost Reporting Rules*

¶19. The State Plan for nursing facilities provides that "[t]he Division of Medicaid defines allowable and nonallowable costs to identify expenses which are reasonable and necessary to provide care to Nursing Facility . . . residents." State Plan 4.19-D, 2-1 (2015), https://medicaid.ms.gov/wp-content/uploads/2021/05/StatePlanEntireDocument-searchable -eff.-1.1.2021- updated-5.26.2021.pdf (last visited May 27, 2021). Thus, "[i]n order for a cost to be an allowable cost for Medicaid reimbursement purposes, it must be reasonable and necessary in the normal conduct of operations related to providing patient care in accordance

with CMS PRM 15-1 guidelines." State Plan 4.19-D, 2-1(A) (2015). Allowable costs are required to be compiled based on generally accepted accounting principles (GAAP). State Plan 4.19-D, 2-1 (2015). However, "[i]n cases where Division of Medicaid cost reporting rules conflict with GAAP, IRS or CMS PRM 15-1, Division of Medicaid rules take precedence for Medicaid provider cost reporting purposes." State Plan 4.19-D, 2-1 (2015). "Allowable costs are based on CMS PRM 15-1 standards except as otherwise described in this plan." State Plan 4.19-D, 2-1 (2015).

¶20.    The State Plan provides a list of allowable costs that "is not comprehensive, but serves as a general guide and clarifies certain key expense areas."    State Plan 4.19-D, 2-1(A) (2015).  "In the absence of specific instructions or guidelines in this plan, facilities will submit cost data for *consideration* for reimbursement."  State Plan 4.19-D, 2-1 (2015) (emphasis added).  The Medicaid Assessment for nursing facilities "referred to in Section 43-13-145(1) . . . , Mississippi Code of 1972, as amended," is specifically listed as an allowable cost on the nursing facility's cost report.[5] State Plan 4.19-D, 2-1(A)(21) (2015). This is "in accordance with the CMS Provider Reimbursement Manual, Part 1, Section 2122.1."[6] *Id.*  The CMS PRM provides that "[t]he general rule is that taxes assessed against the *provider*, in accordance with the levying enactments of the several States and lower levels of government and for which the *provider* is liable for payment, are allowable costs. . . .

---

[5]This is the only allowable cost listed in the State Plan 4.19-D that refers to a specific statutory subsection.

[6]This is the only allowable cost listed in State Plan 4.19-D that refers to a specific section of the CMS PRM.

10

Taxes are allowable costs to the extent they are actually incurred and related to the care of beneficiaries." CMS PRM 15-1 § 2122.1 (emphasis added).

¶21. The hospital Medicaid assessment found in Section 43-13-145(4) is not specifically listed as an allowable cost on the nursing facility's cost report. Additionally, the instructions for filing provide that line 4-43 for taxes and licenses should include "the Medicaid bed tax" (a term for the nursing facility assessment), but make no mention of apportioning the hospital assessment in that line. Nor was the hospital assessment specifically listed as a nonallowable cost for nursing facilities in the 2015 State Plan.[7] It is, however, specifically listed as an allowable cost in its entirety for hospitals in the hospital cost report. State Plan 4.19-A(2-4)(F) (2013) ("The hospital assessment referred to in Section 43-13-145(4), *Mississippi Code of 1972*, will be considered allowable costs on the cost report filed by each hospital[.]"). The hospital State Plan likewise states that this is "in accordance with the Medicare Provider Reimbursement Manual, 15-1, Section 2122.1." State Plan 4.19-A(2-4)(F) (2013).

¶22. Methodist and Specialty primarily argue that Methodist appropriately allocated a portion of its hospital assessment to Specialty for Medicare purposes, and since Medicaid uses Medicare accounting guidance for its cost reports, the inclusion of the hospital assessment on Specialty's Medicaid cost report must be proper. Medicaid does not contest whether such an inclusion was proper on Methodist's Medicare cost report. Medicaid contends that the sole issue is that such an inclusion was not proper on Specialty's Medicaid

---

[7]The State Plan was amended in 2018 to clarify that other Medicaid assessments, including any portion of the hospital assessment, are nonallowable costs for nursing facilities. State Plan 4.19-D, 2-1(B)(7) (2018).

11

cost report.

¶23.   The State Plan for nursing facilities specifically, by code subsection, lists the nursing facility Medicaid Assessment as an allowable cost.  It directly points to CMS PRM 2122.1 as authority for this allowable cost.  CMS PRM 2122.1 allows taxes assessed against the provider and for which the provider is liable as a cost.  The provider for purposes of Specialty's Medicaid cost report is Specialty, not Methodist.  Specialty acknowledges that it is not assessed and is not liable for payment for Methodist's hospital assessment.  The hospital assessment is not referred to at all, much less by its code subsection, in the State Plan for nursing facilities.  The hospital assessment is an allowable cost in its *entirety* for Methodist under the State Plan for hospitals.  Further, the State Plan provides that when Medicaid cost-reporting rules conflict with CMS PRM 15-1, Medicaid rules take precedence. A central conflict between Medicaid cost reporting and CMS PRM 15-1 is that nursing facilities are treated as completely separate providers from any owner hospital for Medicaid cost-reporting purposes but are treated as a cost center of the hospital for Medicare purposes. Medicaid's treatment of nursing facilities as separate providers for purposes of cost reporting, and thus for assessments and reimbursements, is a fundamental difference from Medicare reporting rules that nursing facilities must take into account.  And when such treatment creates a conflict, Medicaid reporting rules trump.

¶24.   The plain language of the State Plan allows a nursing facility to include its Medicaid Assessment in its cost report and allows a hospital to include its assessment in its cost report. The State Plan's plain language further provides that only taxes incurred by the *provider* are

12

properly considered allowable costs for that provider. Because Specialty did not incur Methodist's hospital assessment, Methodist's hospital assessment was not an allowable cost for Specialty under the State Plan.

¶25.    However, "[i]n the absence of specific instructions or guidelines in this plan, facilities will submit cost data for consideration for reimbursement." State Plan 4.19-D, 2-1 (2015). "In order for a cost to be an allowable cost for Medicaid reimbursement purposes, it must be reasonable and necessary in the normal conduct of operations related to providing patient care in accordance with CMS PRM 15-1 guidelines." State Plan 4.19-D, 2-1(A) (2015). Specialty argues that the hospital assessment is a reasonable and necessary cost related to Specialty patient care, essentially arguing that since Methodist owns Specialty, and Methodist and all its divisions, including Specialty, would suffer greatly if Methodist failed to pay the hospital assessment, Methodist's hospital is an allowable cost for Specialty. But the State Plan specifically points to CMS PRM 15-1 guidelines, which provide that taxes assessed against the provider are allowable costs. CMS PRM 15-1 § 2122.1. Specialty is the "provider" for Medicaid cost reporting purposes. The hospital assessment is not assessed against Specialty, nor is Specialty liable for it. And Specialty has a separate assessment it is assessed and is liable for that it does list as an allowable cost. Thus, this argument fails, as the hospital assessment is not assessed against Specialty, and Specialty does account for the nursing-facility assessment that it pays.

¶26.    Moreover, the factual findings by the DOM that such attenuated costs do not benefit Specialty patients is not arbitrary and capricious. To be an allowable cost, the cost "must be

reasonable and necessary in the normal conduct of [Specialty's] operations related to providing patient care . . . ." State Plan 4.19-D, 2-1(A) (2015). Thus, qualifying "reasonable and necessary" is that the cost must be so "in the normal conduct of operations related to providing patient care" of the nursing facility. Specialty fails to demonstrate how Methodist's hospital assessment is a cost that would be incurred by a nursing facility in the normal conduct of operations. All nursing facilities incur certain allowable costs. In the case of a hospital-based nursing facility, certain allocations are allowed for costs the hospital pays on behalf of the nursing facility that the nursing facility, were it a stand-alone facility, would otherwise have to pay directly in the normal conduct of its operations.[8] But Specialty, were it a stand-alone nursing facility, would not have any costs associated with a hospital Medicaid assessment. Nor do stand-alone nursing facilities get to claim any costs associated with a hospital Medicaid assessment. Thus, a *hospital* assessment is not a reasonable and necessary cost that is incurred in the normal conduct of a *nursing facility's* operations related to providing patient care. Specialty therefore fails to meet the qualifier to reasonable and necessary costs that they be incurred in the normal conduct of nursing-facility operations.

¶27. The DOM argues that state law treats nursing facilities and hospitals as separate providers for Medicaid purposes, which essentially amounts to Medicaid assessments and reimbursements, evincing an intent that Specialty not be allocated a portion of Methodist's Medicaid assessment. The DOM also points out that in paying the nursing facility

---

[8]For example, a stand-alone nursing facility would directly incur laundry costs. A hospital-based nursing facility may use a centralized hospital-laundry facility shared by several departments. The hospital would be able to properly allocate a portion of its laundry costs to the nursing facility as well as to its other departments.

assessment, Specialty already pays the maximum amount allowed by federal law. Miss. Code Ann. § 43-13-145(1)(a) (Rev. 2015) ("Upon each nursing facility . . . , there is levied an assessment in an amount set by the division, equal to the maximum rate allowed by federal law or regulation, for each licensed and occupied bed of the facility."). The DOM argues that this further bolsters that the legislature did not intend for Specialty to be allocated a portion of Methodist's assessment, as Specialty's paying more than the maximum rate would violate federal law.

¶28. The Medicaid State Plan and statutes clearly separate the nursing-facility assessments from the hospital assessments and treat Specialty and Methodist as completely separate providers for those purposes. Accordingly, the decision to disallow a portion of Methodist's assessment from Specialty's cost report was not error, even under a de novo standard of review of the DOM's interpretation of its rules and regulations.[9]

### 3. *Retroactivity/The Administrative Procedures Act (APA)*

¶29. Specialty argues that the DOM allowed the inclusion of a portion of the hospital assessment on Specialty's cost reports for several years and improperly changed its interpretation of the State Plan to disallow a portion of the hospital assessment as a cost without notice. It also argues that the DOM improperly changed the State Plan without following the Administrative Procedures Act. The DOM argues that it did not change its interpretation of the State Plan, arguing that the hospital assessment was never an allowable cost for nursing facilities under the plain language of the State Plan. It asserts that "[a]ny

---

[9]Because the DOM and chancery court did not err, this Court will not address the "netting" argument.

15

unintentional failure by DOM to recognize the assessment on Specialty's Cost Reports in years prior does not change the text of the State Plan."

¶30.   "[A]n agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 21 So. 3d 600, 609 (Miss. 2009) (internal quotation marks omitted) (quoting *Miss. Valley Gas Co. v. Fed. Energy Reg. Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)), *abrogated on other grounds by King*, 245 So. 3d 404.  While Specialty asserts that it included Methodist's hospital assessment as an allowable cost in its Medicaid cost report in previous years without incident, it does not offer any evidence that allowing a hospital assessment on a nursing-facility cost report was an affirmative "norm" or "decision" by the DOM.  Indeed, testimony by DOM employees indicated that the DOM simply did not notice that some hospital-based nursing facilities were including the hospital assessment as a cost because the allocation was lumped into a calculation that included several costs, and determining that the hospital assessment was included in that number took several calculations.   Even principles of equitable estoppel require reliance on a representation, and Specialty points to no affirmative representation by the DOM that the hospital assessment was an allowable cost for nursing facilities.  *See Cent. Miss. Med. Ctr.*, 294 So. 3d at 1129.

¶31.   Furthermore, because the hospital assessment is not specifically listed in the State Plan as an allowable cost for nursing facilities, Specialty had no justification to rely on its being included in allowable costs.  The State Plan specifically placed Specialty on notice that "[i]n

16

the absence of specific instructions or guidelines in this plan, facilities will submit cost data for *consideration* for reimbursement." State Plan 4.19-D, 2-1 (2015) (emphasis added). In this case, the cost data was considered and rejected. Moreover, the DOM explained its reasoning for disallowing the hospital assessment as an allowable costs. In any event, agencies may correct mistakes of law, even when a party relied to its detriment on the mistake. *See Dixon v. United States*, 381 U.S. 68, 72-73, 85 S. Ct. 1301, 14 L. Ed. 2d 223 (1965) (IRS may correct mistakes of law).

¶32. The argument that the DOM violated the APA likewise fails because Specialty fails to show that this interpretation is "new," rather than applying the plain language of the State Plan when the DOM previously mistakenly overlooked that Specialty was not following the State Plan rules. Moreover, "the DOM's State Plan is not a rule that must comply with the notice requirements of the Mississippi APA." *Methodist Specialty Care Ctr. v. Miss. Div. of Medicaid*, 305 So. 3d 1088, 1102 (Miss. 2020).

## CONCLUSION

¶33. This Court ceases our deference to agency interpretations of their own rules and regulations and will review such interpretations de novo. Even under a de novo standard of review, the DOM did not err by disallowing Methodist's hospital assessment as a cost on Specialty's cost report. Under the plain language of the State Plan, and according to the clear delineation of Specialty and Methodist as separate providers by Medicaid statutes, the hospital assessment was not an allowable cost for the nursing facility. This Court therefore affirms the decisions of the chancery court and the DOM.

17

¶34.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶35.    Mississippi Methodist Hospital and Rehabilitation Center Inc.'s hospital assessment was properly allocated and should be included as an allowable cost in Methodist Specialty Care Center's cost report.  Accordingly, I respectfully dissent.

**FACTS AND PROCEDURAL HISTORY**

¶36.    Methodist Specialty Care Center (Specialty) is a hospital-based nursing facility owned and operated by Mississippi Methodist Hospital and Rehabilitation Center Inc. (Methodist). Specialty specializes in the treatment of patients with severe disabilities such as spinal-cord injuries, closed-head injuries, permanent ventilator-dependent patients, permanent tracheotomy patients, patients with quadriplegia, and others who require total and maximum assistance with daily-life activities.

¶37.    Under Mississippi Code Section 43-13-145(4) (Supp. 2020), the Division of Medicaid (DOM) levies a hospital assessment annually on each Mississippi hospital, which helps fund the Medicaid program as well as the Disproportionate Share (DSH) and Upper Payment Limit (UPL) supplemental-payment programs.  For the 2014-2015 cost-reporting period, Methodist was assessed $2,576,255.  Methodist allocated this hospital assessment to its various departments, including Specialty.  Specialty then followed its usual practice and included its allocated portion of the hospital assessment in its own cost report as an allowable

18

cost.

¶38. Specialty timely submitted its cost report for the 2014-2015 cost-reporting period. Specialty's cost report was subject to a desk review in order to "evaluate the necessity and reasonableness of facility costs in order to determine the allowable costs used in the calculation of the prospective per diem rate." The DOM is charged with this obligation, which includes the duty to ensure that Medicaid care is provided in an economic fashion. As part of its obligation to safeguard taxpayer funding and to conserve scarce public resources, the DOM is authorized to correct errors and mistakes found in nursing-home cost reports.

¶39. The DOM's desk review of Specialty's cost report resulted in a report dated November 17, 2016. The review disallowed $539,681 from Specialty's cost report because the DOM determined that the annual hospital assessment, paid by Methodist, was not an allowable cost or a cost incurred by Specialty. Specialty appealed the DOM's desk review to the Reimbursement Bureau, which denied Specialty's request to reverse the adjustment.

¶40. Specialty appealed the Reimbursement Bureau's decision and requested an administrative hearing. After an administrative hearing was conducted, the hearing officer issued a report and recommendation finding that Methodist's hospital assessment had been properly excluded from Specialty's cost report. The hearing officer found that Specialty had presented no evidence that Methodist's payment of the hospital assessment or its allocation to Specialty had provided any benefit to Specialty's patients.

¶41. The DOM's executive director adopted the hearing officer's report and recommendation and entered a final decision disallowing the hospital assessment from

19

Specialty's cost report. Specialty appealed the final decision to the Hinds County Chancery Court. After oral arguments, the chancellor affirmed the DOM's final decision. Specifically, the chancellor found,

> The hearing officer specifically considered the arguments set forth by Specialty and determined that payment of a portion of a hospital assessment conferred no benefit on a provider-based nursing facility or its patients. He noted that Specialty offered no evidence of a specific benefit to Specialty or its residents, but only to the general proposition that it received benefits from the funds received by [Methodist]. He relied upon the testimony of witnesses, the argument of counsel, and the interpretation of the relevant sections of the State Plan. He also noted the nursing homes have their own assessments, called a bed tax, which is an allowable cost under the applicable State Plan. After careful consideration of all these matters, the hearing officer determined that Specialty and its residents did not receive a benefit. It is not the role of this Court to determine whether the hearing officer and DOM reached the correct interpretation of this rule. Instead, the Court must consider whether this interpretation of the agency's rules and regulations is supported by substantial evidence. This Court must so find.

¶42. Specialty timely appealed to this Court. On appeal, Specialty asserts (1) the DOM erred by disallowing the hospital assessment, (2) the DOM erroneously applied its new rule retroactively, and (3) the DOM violated Mississippi Administrative Procedures Law.

**STANDARD OF REVIEW**

¶43. "This Court employs the same standard of review that our lower courts are bound to follow when reviewing agency decisions." *Miss. Div. of Medicaid v. Windsor Place Nursing Ctr., Inc.*, 296 So. 3d 68, 72 (Miss. 2020) (citing *Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid*, 240 So. 3d 385, 387 (Miss. 2018)). "Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law." *Id.* (internal

20

quotation marks omitted) (quoting *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993)). "An administrative decision may be reversed if the decision '(1) was not supported by substantial evidence, (2) is arbitrary or capricious, (3) was beyond DOM's power to adopt, or (4) violates a constitutional or statutory provision.'" *Id.* (quoting *Wilson*, 624 So. 2d at 489).

¶44. "Interpretation of a rule or regulation governing the agency concerns a matter of law, which is reviewed de novo, with great deference afforded to the agency's interpretation of the rule." *Id.* (citing *Sierra Club v. Miss. Env't Quality Permit Bd.*, 943 So. 2d 673, 678 (Miss. 2006)). But this deference "does not extend to an agency's interpretation of a statute, 'which is properly reserved to the courts of this state.'" *Id.* (quoting *King v. Miss. Military Dep't*, 245 So. 3d 404, 408 (Miss. 2018)).

## ANALYSIS

*I.      Methodist's allocation of the hospital assessment was proper.*

¶45. Under Mississippi Code Section 43-13-145(9) (Supp. 2020), Methodist has no discretion as to whether it must pay the hospital assessment. Because Methodist cannot opt out of paying the hospital assessment, it becomes a necessary and reasonable administrative and general (A&G) cost of the hospital. The Medicaid State Plan instructs providers to adhere to the federal government's Medicare Provider Reimbursement Manual (PRM) 15-1 when completing cost reports for Medicaid purposes. *See* Ctrs. for Medicaid and Medicare Servs., *Provider Reimbursement Manual* 15-1 § 2306.1 (PRM 15-1). Despite the Medicaid State Plan's specific directive for providers to follow PRM 15-1 to determine allowable

21

costs, the DOM arbitrarily and improperly disregarded PRM 15-1 requirements.

¶46. With regard to A&G costs such as the hospital assessment, PRM 15-1, Section 2306, requires that a hospital allocate those costs to all departments (also known as "cost centers") of the hospital. Section 2306.1 of PRM 15-1 states, "[a]ll costs of nonrevenue-producing centers are allocated to all centers which they serve, regardless of whether these centers produce revenue." Accordingly, all costs of Methodist's A&G cost center, a cost center that serves Specialty along with its sister departments, must be allocated in part to Specialty. Therefore, as a department of the hospital, Specialty must share in the A&G costs of Methodist.

¶47. The amount of the A&G costs attributable to Specialty and other hospital departments is determined by the "step-down" method of cost allocation. This step-down method is the default methodology and has been adopted by both Medicare and Medicaid. *See* PRM 15-1 § 2306.1.

¶48. The DOM asserts that no part of the hospital assessment should be allowed on Specialty's cost report because (1) Specialty received no benefit from Methodist's hospital tax assessments and (2) Specialty is a separate entity from Methodist. According to the DOM, Methodist should not allocate or "step-down" a portion of the hospital assessment to Specialty because the cost was not "incurred" by Specialty, and the cost allegedly does not "benefit" Specialty's patients. I disagree and find that Methodist's hospital assessment should be included in Specialty's cost report.

        *A.*     *Specialty is not a separate entity*.

22

¶49. The DOM argues that Methodist and Specialty are two separate and distinct entities and providers. But according to Methodist's chief financial officer, Gary Armstrong, Specialty is simply a department of Methodist. Armstrong explained,

> We have a list of departments and when you look at our lists of departments you'll see radiology, you'll see outpatient rehab, you see orthotics and prosthetics, you'll see Methodist Specialty Center. And Methodist Specialty Center has a name, just like Methodist Outpatient Rehab does and Methodist Orthotics & Prosthetics does. And so *it's just another department of the hospital*.

(Emphasis added.) Additionally, Shane Hariel, a certified public accountant and an expert in the field of Medicare and Medicaid reimbursement, testified:

> And I think the thing that's confusing to me is as I've listened to testimony is it somehow built like this separate wall around the nursing home, like it's some separate entity. I mean, the nursing home, just like it is in every one of my clients that have a hospital-based nursing home, the nursing home is just a service line of the hospital, a department of the hospital. They have a separate Medicaid billing number, but in terms of the management, the infrastructure of how they're managed and operated, they're just a different service line of the hospital that's operating them. They have to be that integrated to be considered provider based for Medicare purposes.

¶50. In support of its argument that Specialty is a separate entity, the DOM relies on the fact that Methodist and Specialty file separate Medicaid cost reports. But the very definition of a hospital-based nursing facility contemplates that it will file a separate cost report while receiving overhead allocated from the hospital.

¶51. The hospital-based nursing-facility costs are included in the hospital's Medicaid cost report. But the DOM requires all nursing facilities to file their own Medicaid cost reports. Therefore, for Medicaid purposes, Methodist files one cost report that includes the costs and revenue associated with Specialty, but Specialty is required to file a cost report as well. The

filing of a separate Medicaid cost report is a requirement by the DOM, and it is not grounded in the relationship between Specialty and Methodist. It merely offers Medicaid a separate accounting of the nursing facility's costs. Specialty does not become a separate and distinct facility because Medicaid requires it to file its own cost report. Regardless of their separate Medicaid cost reports, Specialty remains a department of the hospital that treats patients, a service for which compensation is due and properly provided.

### B. Specialty's patients benefit from the hospital assessment.

¶52. The DOM asserts that in order for a cost to be allowed, it must be directly related to patient benefit or patient care. As a result, the DOM argues that the hospital assessment was improperly allocated because it did not benefit Specialty's patients. But such an argument is not supported by the Medicaid State Plan or the PRM and is contrary to the evidence and testimony presented.

¶53. "Cost Finding" is defined by PRM 15-1 as "the determination of the cost of an operation by the assignment of direct costs and the allocation of indirect costs." PRM 15-1 § 2302.7. The DOM's argument regarding a direct benefit would defeat the entire point of allocation and exclude indirect costs based on nothing more than its own subjective finding to pay Specialty less money.

¶54. The DOM asserts that the payment of the hospital assessment in no way benefits Specialty's patients because Specialty does not share in the funds generated from the hospital assessment. When asked in what way the hospital assessment benefits Specialty's residents, Manuel Pilgrim, the DOM's director of financial and compliance review, stated, "it doesn't."

24

Pilgrim explained that the hospital assessment is "strictly related to the hospital program and hospital payments." Yet the evidence shows that the $104 million to be collected as part of the hospital assessment is to be used as state matching funds for the Mississippi Medicaid program. The funds are used for the entire Medicaid program, not just the hospital portion of the Medicaid program as alleged by the DOM. Thus, the DOM's assertion that the hospital assessment benefits only hospitals and hospital funds is erroneous. The collected assessments form a pool from which reimbursement is used for all Medicaid-participating providers, including Specialty.

¶55. Additionally, not only does the hospital assessment provide money for the Medicaid general fund, it also helps fund the DSH and UPL supplemental programs. The total hospital assessment paid on behalf of Methodist for the 2014-2015 cost-reporting period was $2,576,255, and Methodist received three UPL payments totaling $1,689,444 during this same period. The UPL payments received by Methodist were deposited into its main operating accounting, and this operating account is utilized for the benefit of all departments of the hospital, including Specialty. As Armstrong explained,

> But we have one operating account. And the one operating account is for all of the departments, including Specialty Care Center, Outpatient Rehab, whatever. We have one accounts payable. So we are writing checks out of that operating accounting for all of the departments across the hospital. . . . All of the [UPL] checks just go straight into the operating account and [are] used as needed by the different departments.

Additionally, Hariel explained, "[s]o it's not like the nursing home has this pot of money and this hospital has this pot of money and you live off that and we'll live off this. I mean, they share the same bank account." When asked whether the nonpayment of the hospital

25

assessment would impact Specialty and its patients, Hariel stated, "[w]ell, again, I go back to they all share one bank account. And if you cut off your Medicaid money, that's going to impact the nursing home." Therefore, the receipt of the UPL payment provides funds used to benefit patient care at Specialty as well as other hospital departments. Regardless of whether these funds are paid directly or indirectly to Specialty, they are nonetheless used in the continued pursuit of providing patient care.

¶56. Further, while the UPL funds are deposited into Methodist's operating account, Methodist does not earmark those funds only for its benefit. When asked if the money that Methodist receives can be used to the benefit of a nursing facility, Hariel stated, "Oh, yeah. Absolutely. And in most of my hospitals it is used. It's used throughout the organization where it's needed. I mean, there's no restriction once that hospital gets the UPL, DSH, whatever, there is no restriction for the hospital and how they use it." Hariel further stated that there were no regulations restricting what healthcare services Methodist uses its reimbursements for.

¶57. [A]n administrative agency's decision is considered to be arbitrary "when not done according to reason and judgment, but depending on the will alone." A capricious action is defined as being "done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles."

*Beverly Enters. v. Miss. Div. of Medicaid*, 808 So. 2d 939, 943 (Miss. 2002) (quoting *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So. 2d 973, 977 (Miss. 1999)). The DOM's final decision that the hospital assessment does not benefit Specialty's patient care was not "done according to reason and judgment" and implies "either a lack of understanding

26

of or a disregard for the surrounding facts and settled controlling principles." ***Id.*** (internal quotation mark omitted) (quoting ***Natchez Cmty. Hosp.***, 743 So. 2d at 977). Accordingly, such decision is arbitrary and capricious and should be reversed.

II. *The DOM's disallowance of the hospital assessment was improperly applied retroactively.*

¶58. Specialty asserts that "after decades of telling Specialty and other hospital-based nursing facilities to include their portions of any such [hospital] [a]ssessment allocation, [the DOM] suddenly declared that this was not an 'allowable cost.'" Specialty notes that despite the DOM's decision to exclude the hospital assessment as an allowable cost in Specialty's 2014-2015 cost report, it was not until 2018 that the DOM formally submitted a proposed amendment to the Medicaid State Plan expressly defining the cost as nonallowable.[10] Thus, Specialty claims that the DOM improperly applied the new amendment retroactively. I agree.

¶59. Methodist and Specialty allocated their expenses the same way for years, and the DOM approved the previous cost reports. Richard Lefoldt, an expert in the field of Medicaid and Medicare cost reimbursement, testified that he had prepared Specialty's cost reports since 2004 and that the DOM had allowed the tax assessment in the years prior to 2014-2015. To suddenly disallow this cost is indisputably a change in the enforcement of the Medicaid State Plan that greatly affects provider reimbursement, a $539,681 single-year impact for Specialty alone. Given the significance of this change in interpretation and policy, the DOM

---

[10] In 2018, the DOM issued a Medicaid State Plan Amendment disallowing such an allocation for the first time. It is undisputed that the amendment was not in effect at the time Specialty's 2014-2015 cost report was reviewed and the decision regarding the allocation was made.

should have been required to file a State Plan Amendment outlining the proposed changes and to submit it to the secretary of state. This would have afforded the provider community notice of the proposed changes and an opportunity to offer comments.

¶60. According to Pilgrim, no notice was required of the change because the providers had access to "the Provider Reimbursement Review Manual and the Mississippi State Plan, which basically instructs them how they should, you know, complete cost reports." But nothing in the PRM or the Medicaid State Plan would have put providers on notice that the hospital-assessment allocation was no longer an allowable cost for hospital-based nursing facilities. The majority finds, "[t]he State Plan specifically placed Specialty on notice that '[i]n the absence of specific instructions or guidelines in this plan, facilities will submit cost data for *consideration* for reimbursement.' In this case, the cost data was considered and rejected." Maj. Op. ¶ 31 (citation omitted). But while the cost report for 2014-2015 was considered and *rejected*, prior cost reports that included the hospital assessment as an allowable cost were considered and *approved*. Thus, I disagree with the majority that "because the hospital assessment is not specifically listed in the State Plan as an allowable cost for nursing facilities, Specialty had no justification to rely on its being included in allowable costs." Maj. Op. ¶ 31. Indeed, there was no change in the Medicaid State Plan language but, instead, a change in the way the existing Medicaid State Plan was applied or interpreted.

¶61. In an attempt to explain the change in interpretation, Pilgrim testified that no change had actually occurred. Instead, according to Pilgrim, the hospital-assessment allocation had

28

been "incorrectly" allowed for all these years. He explained,

> Again, it was not a change in the interpretation of it. It was basically an identification that it had not been being applied. As far as whether the other people here didn't know, I can only speculate. Maybe they didn't have the understanding of the way a hospital step-down worked so that they could say, okay, the provider has included this cost and then allocated a portion of that down to the nursing facility in order to identify that, yes. These costs should not have been allocated here and therefore we need to remove them.

In other words, everyone at the DOM prior to Pilgrim's arrival was incorrectly interpreting PRM 15-1 and the Medicaid State Plan to allow this hospital-assessment allocation to be included in hospital-based nursing-facility cost reports such as Specialty's. Likewise, for all these years, experienced cost-report preparers such as Hariel and Lefoldt have apparently been incorrectly interpreting these guidelines and regulations.

¶62. The DOM departed from its long-standing interpretation that sanctioned allocation of the hospital assessment to hospital-based nursing facilities like Specialty. The DOM told no one of this change but expected the provider community to comply with this new standard of allowability of costs and applied it retroactively to open or pending cost reports. "An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Miss. Valley Gas Co. v. Fed. Energy Regul. Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981) (citing *Sec'y of Agric. of U.S. v. United States*, 347 U.S. 645, 653, 74 S. Ct. 826, 98 L. Ed. 1015 (1954) (agency "has not adequately explained its departure from prior norms and has not sufficiently spelled out the legal basis of its decision")). "[T]hose regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'" *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir.

29

2008) (quoting ***Ala. Pro. Hunters Ass'n v. FAA***, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds* by ***Perez v. Mortgage Bankers Ass'n***, 575 U.S. 92, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015)). Pilgrim can offer no basis for the change in interpretation other than his own speculation and subjectivity. The DOM's excuse of an "unintentional failure by DOM to recognize the assessment on Specialty's Cost Reports in years prior" is simply inexcusable and implies that the DOM's exclusion of the hospital assessment was without reason or justification.

¶63. The DOM failed to present evidence that it has ever taken the position that the hospital assessment was not an allowable cost. The DOM's argument that it "*simply did not notice* that some hospital-based nursing facilities were including the hospital assessment as a cost because the allocation was lumped into a calculation that included several costs" is insufficient and inexcusable. Maj. Op. ¶ 30 (emphasis added). Accordingly, the DOM's change in interpretation of the allocation of the hospital assessment should only apply prospectively, not retroactively, as the amendment regarding the disallowance of the hospital assessment was not in effect at the time Specialty's 2014-2015 cost report was reviewed.

> III. *Whether the DOM violated Mississippi Administrative Procedures Law.*

¶64. Specialty last argues that the DOM's actions violated Mississippi Administrative Procedures Law. Because I find reversible error regarding issues one and two, I do not address Specialty's third and last issue.

### CONCLUSION

¶65. The testimony and evidence presented in this matter do not support the desk-review

adjustment proposed by Medicaid.  Methodist properly allocated the hospital assessment to Specialty, and Specialty properly included its allocated portion of the hospital assessment in its own cost report as an allowable cost.  Accordingly, I find that the chancery court's decision should be reversed, and the hospital assessment, as allocated by Methodist and included in Specialty's cost report, should be affirmed.